## W. W. ROBERTS v. RAY BELL FILM COMPANY AND ANOTHER.[1]

November 24, 1939.

No. 32,235.

[1] Reported in 288 N. W. 591.

352

*Irving H. Green* and *E. J. Culhane,* for relator.
*Kelly & Mangan,* for respondents.

JULIUS J. OLSON, JUSTICE.

Relator brings *certiorari* to review an order of the industrial commission denying him compensation on the ground that the injury for which an award was sought "did not arise out of and in the course of the employment of said employe."

The record permits a finding of the following facts: Employe was a salesman for Ray Bell Film Company. His assigned territory was South Carolina. Bell company is engaged in the business of film advertising. The employe's duties were to call upon merchants, theater owners, and other businessmen who might be prevailed upon to enter into that form of advertising. He received a short period of training from one Mr. Fuehrer, acting for the employer. He commenced his work during the early part of April, 1938, in the assigned territory. His compensation was upon a "straight commission basis." He furnished his own means of transportation, paid all of his subsistence and other expenses, selected his own locations, and the manner and means of contacting those whom he solicited to become subscribers to the Bell service. He had no drawing or expense account. During the months of April, May, and June he made his headquarters at Batesburg, South Carolina, and from that point worked the adjacent territory. While there he became involved in financial difficulties, being unable to pay his hotel bill, and the finance company repossessed his car. On July 8, being without funds, he

sent a telegram ("Collect") to his employer from Hendersonville, North Carolina, saying: "Got ride here with brother. Forced out of Batesburg. One Hundred Dollars expenses needed immediately. * * * Will continue work if cooperated with." His employer immediately wired (prepaid): "Will continue to pay commissions promptly on accepted business but cannot advance beyond that * * *."

On July 3, employe's brother, the latter's wife and young son, together with a negro servant, met him at Batesburg while on their way to Hendersonville, North Carolina, about 100 miles from Batesburg, to spend their vacation there. (The brother's home was at Miami Beach, Florida.) He went with them, engaging a room for a week at the same place, the Flack Hotel, about nine miles from Hendersonville. The hotel is large and somewhat of a rambling structure (characterized by the employe as "a real hillbilly hotel") located in the heart of the vacation district of North Carolina, and is much frequented by vacationists. On July 5 and 6 employe was ill. The next two days he claims to have called upon some prospective customers in adjacent towns but procured no business.

The proprietor of the hotel was accustomed to hold a dance at the hotel every Tuesday and Friday night for the benefit of guests and near-by residents. The evening of July 8 was devoted to this kind of entertainment, and the employe and numerous other guests availed themselves thereof. About half past twelve o'clock that night he, together with at least a dozen or more other young people who had attended the dance, went to the room of one Wadsworth located on the third floor of the hotel and there engaged in telling jokes and stories, also deriving some entertainment from drinking highballs. The employe, so he claims, had but one. He asserts that at about nine o'clock that evening he had engaged in conversation with Wadsworth and had made an appointment with him to meet him at Jacksonville, Florida, for the purpose of selling film advertising. Mr. Wadsworth was engaged in the lumber business there. The deposition of Mr. Wads-

worth clearly explains the nature and purpose of the gathering in his room. He testified that he knew nothing about the employe's business and denied having had any conversation whatsoever with him of a business nature. Jacksonville is some 400 miles distant from the hotel where the gathering in Mr. Wadsworth's room took place.

The employe claims that he contacted these young people and particularly Mr. Wadsworth to help him in getting acquainted and thereby to lay a foundation for some future acquirement of business relationships and consequent profit to his employer and personal gain for himself. But the triers of fact could well conclude, as testified to by Mr. Wadsworth, that "it was an impromptu affair * * *. We were just having a general bull session, talking. In fact that is all he [Roberts] did." No one was there "entertaining anybody in connection with their business." Witness did not "know until today * * * the nature of Mr. Roberts' business." His deposition and that of three others who also attended this gathering were taken January 20, 1939, at Jacksonville, Florida. Not one of these witnesses heard or as much as suspected that there was anything of a business nature talked or considered. The room in which the gathering took place was small, 10 or 11 feet by 12 feet. It was furnished with one chair, a bed, and a trunk. There being 12 to 15 persons present, seating capacity was obviously at a premium. Perhaps that accounts for the fact the employe had one of the girls sitting on his lap. The party broke up about three o'clock in the morning. When Wadsworth and three lady friends left, "Mr. Roberts was lying on the bed there asleep." Apparently they were the last (except Roberts) to leave. Their reason for leaving was that they wanted to drive to Hendersonville "to get something to eat." When they returned ("close to daylight" and after the accident) Roberts had been taken to a hospital. The witness went there and tried to talk to Roberts, but the latter appeared "dazed, he didn't know then just what had happened." The next day he again visited Roberts at the hospital to ascertain how the accident came about. The following quotation is important:

Q. "What did he tell you took place after you left him?

A. "He told me that he had awakened and went out of the room and went to the lavatory and walked through this corner and said he stumbled and put his hand out when he stumbled and reached for something, and there wasn't anything there, and he said that was all he remembered until he woke up on the ground and he couldn't move, and called his brother; he started calling for his brother.

Q. "Was his brother stopping at the hotel?

A. "His brother was there, they had rooms similar to ours, similar to the ones we had on the third floor. Theirs were on the first.

Q. "Did he tell you what floor he was on when he had put out his hand?

A. "Yes, he was on the third floor."

(The witness thereupon described the location of lavatories on the various floors and the means of getting thereto.)

At the trial the employe testified that about five minutes after the departure of the others from Wadsworth's room he started for his own room on the first floor and then, after getting there, concluded he had to go to the lavatory. There was one on his own floor, but he thought it was occupied; that he thereupon went to the third floor, although there were lavatories also on the second, and on his way stumbled and fell to the ground below, receiving the injuries for which compensation was sought.

On August 15, 1938, W. L. Thunstedt, a shorthand reporter, and one L. N. DeMoully visited the employe at Northwestern Hospital, in Minneapolis, for the purpose of ascertaining the circumstances connected with his injuries. At that time he said nothing about going down to the first floor and then going back to the third. His testimony upon cross-examination before the referee admits that he remembers the coming of Mr. DeMoully and the reporter and also that Mr. DeMoully asked how the accident happened and that he explained it to him. His explanation is that because of the opiates he was under he could not remember having told

DeMoully that he went directly from Wadsworth's room to the third floor lavatory. The reporter for the industrial commission testified that relator answered the questions put by Mr. DeMoully readily and without hesitancy; that he was friendly and coöperative; that the employe did not appear to be under the influence of any drugs; and that when the reporter could not spell a certain name—the name of the sales manager who first hired and coached him on his job—relator spelled it out for him—F u e h r e r.

The employe in his reply brief says that what occurred at the gathering in Wadsworth's room "is of no consequential importance," wherefore he no longer stresses "that point." He urges, however, that "the important fact is that he left this room and went to his own room and then while on the way to the lavatory * * * was injured." It is therefore his claim that "he was then again in the same situation and should be treated in the same manner as if he had immediately gone to bed and the hotel had burned down while he was asleep." He cites and heavily relies upon Stansberry v. Monitor Stove Co. 150 Minn. 1, 183 N. W. 977, 20 A. L. R. 316, and other cases of like import.

■ We have said so many times that a repetition seems trite that "It is for the triers of fact to choose not only between conflicting evidence but also between opposed inferences." Reinhard v. Universal Film Exch. Inc. 197 Minn. 371, 375, 267 N. W. 223, 225.

■ Equally well established is the rule that the statutory relationship of employer-employe must exist and be in force at the time of accident before liability can attach. In other words, (197 Minn. 375, 267 N. W. 225) "the injury must arise out of and in the course of the employment." Let us assume under similar facts to those here appearing that the employe had so driven his car as to cause harm to a third party; could we, sitting in review, reverse the triers of fact if they had found, as they did here, that the employer-employe relationship at time of accident did not exist?

■ Employe's testimony in the light of all relevant circumstances does not appear "inherently so credible" (McCarty v. Twin City E. & P. Assn. 172 Minn. 551, 553, 216 N. W. 239) as to require the commission to accept it as being entitled to full faith and credit. For that reason, the findings here assailed cannot be ·set aside by us without going far afield from our former decisions. Interesting and instructive on this phase is Johnson v. Nash-Finch Co. 197 Minn. 616, 268 N. W. 1. We refrain from stating the facts and the conclusion reached but invite careful reading of that opinion in the light of the employe's contentions.

The Stansberry case, 150 Minn. 1, 183 N. W. 977, is easily distinguishable upon its facts from those here involved.

We have stated the facts rather fully because the employe has so earnestly urged that there was no fact question at all for the triers thereof to determine; hence that as a matter of law the result reached below was erroneous and our duty is to reverse. We think otherwise.

The writ is discharged and order affirmed.

